## 7012

### *IN RE* DUNCAN.

ATTORNEYS.—Mr. John T. Duncan, a member of the Richland Bar, is forever disbarred and stricken from the roll of attorneys of this Court, because the Court finds that he knowingly used false and fictitious affidavits in presenting a motion to this Court.

Rule issued by this Court on its own motion against John T. Duncan, requiring him to show cause why he should not be disbarred.

*Attorney-General J. Fraser Lyon,* for the State, at the request of the Court.

*Mr. O. L. Schumpert,* contra.

September 11, 1908. The opinion of the Court was delivered by

CIRCUIT JUDGE MEMMINGER, *acting Associate Justice in place of* MR. JUSTICE GARY, *disqualified.* At the May, 1906, term of the Court of General Sessions for Richland

county, Judge Klugh presiding, Jesse Hunter, a negro, was tried and convicted under a charge of firing upon and wounding one of a magistrate's posse sent to his house to arrest him.

John T. Duncan, Esq., of the Richland County Bar, defended Hunter, and after conviction moved Judge Klugh for a new trial, which was refused. An appeal to the Supreme Court was then taken and *supersedeas* bond given, the wife of said Duncan being one of the sureties thereon.

There was considerable delay in perfecting this appeal, but, pending the *supersedeas,* in December, 1907, in conformity with the practice then effective, as to motions for new trials on after-discovered evidence, Mr. Duncan moved the Supreme Court for leave to apply to the Circuit Court on the ground of such after-discovered evidence; the said evidence purporting to be, among others, an affidavit of one Jeff Taylor, stating that he was at Hunter's house at the time of the shooting for which Hunter had been convicted, and that he, not Hunter, did the shooting.

This motion was resisted by Mr. Solicitor Timmerman, then solicitor of the Fifth Circuit, of which Richland county was then a part. The Supreme Court refused this motion, but, thereafter, Mr. Duncan obtained a stay of the *remittitur,* and the motion came up for hearing at the next succeeding term of this Court, in May, 1908. In the meanwhile, by an act of the legislature, Mr. Solicitor Timmerman was put into the Eleventh Circuit, and to the solicitorship of the Fifth Circuit, composed of Richland and Kershaw counties, the Governor had appointed Christie Benet, Esq., of the Richland bar. When, therefore, the said motion came up, in May, 1908, as aforesaid, Mr. Solicitor Benet represented the State; being notified of the motion, and appearing therein, produced and read an affidavit from Jeff Taylor, entirely denying that he had ever made the affidavit which Mr. Duncan claimed he had made confessing to said shooting; an affidavit from Jesse Myers, denying that he had ever

authorized an affidavit purporting to be from him, which Mr. Duncan was using in support of his motion, in which Myers stated that Taylor was at Hunter's house at the time of the shooting, and other affidavits corroborative thereof. At the trial of the cause Taylor had testified that he was not at Hunter's house and knew nothing of the shooting.

Mr. Duncan, claiming to be entirely shocked and surprised at the production of these affidavits, asked for time in which to reply thereto and was given by the Court until June 2, 1908, at which time the matter being again brought up, and, as and for a showing in reply to said affidavits, Mr. Duncan insisted upon reading to the Court his own affidavit, couched in fierce and denunciatory language, the substance of which was to vilify Solicitors Timmerman and Benet, and to accuse them, together with Magistrate Lykes, who had committed Hunter upon the shooting charge, and others in anywise connected with that prosecution, of a vile conspiracy ("a conspiracy dark and damnable") to exculpate Taylor, convict Hunter and his wife, and injure and degrade him, Duncan, as a lawyer; and, in support of the genuineness of the Taylor affidavit, he submitted an affidavit purporting to be from his former stenographer, Mrs. Stewart, going to show a very distinct recollection on her part of the circumstances of the making of that affidavit, its substance and its genuineness.

Whereupon, the said motion for leave to apply for a new trial was again refused, and on the same day this Court, of its own motion, issued an order as follows:

"From the affidavits in the cause of *The State* v. *Jesse Hunter and Frances Hunter*, it appears that charges are made, under oath, that John T. Duncan, an attorney of this Court, has knowingly submitted to this Court false and fictitious affidavits.

"It is considered by the Court that the said charges should be investigated. Therefore, it is ordered that the said John T. Duncan do show cause before the Supreme Court on

Monday, June 8, 1908, at 10 o'clock a. m., why he should not be attached for contempt or disbarred as an attorney for submitting said affidavits.

"Ordered further, a certified copy of this order be forthwith served on the said John T. Duncan.

Y. J. Pope, Chief Justice.
Ira B. Jones, A. J.
C. A. Woods, A. J."

And on June 6th, by a *per curiam* order, Mr. Attorney-General Lyon, being requested by the Court to conduct the investigation and trial under its said order of June 2d, on motion of said Attorney-General the hearing under the order of June 2d being deferred until July 15th; on June 10th the Court made another order in the matter, whereunder said Duncan was directed at the same time, to wit, July 15, 1908, also to show cause why he should not be attached for a contempt of this Court on account of having vilified its officers in the presence of the Court, and used towards them such offensive language as would be unwarrantable to be used in this Court under any circumstances, and so couching his charges against them, and other persons, in such harsh and intemperate language and invective as to bring himself into the contempt of this Court aforesaid.

Associate Justice Gary being disqualified, by reason of relationship to said Duncan by affinity, and not having participated in any of these proceedings, on July 16, 1908, Circuit Judge Memminger, having been assigned by the Governor to take the place of Justice Gary, and the Court being thus composed and ready to proceed with the matter, Mr. Schumpert, appearing for Mr. Duncan, and Mr. Attorney-General Lyon, for the State, due return was made to said orders on behalf of Mr. Duncan; the return being, as to the first order, under which disbarment was involved, for presenting false and fictitious affidavits; in substance, a detailed statement of the circumstances under which he claimed the Taylor and Myers affidavits were obtained, and

thus presenting a clear issue of fact upon this question; as to the second order, under which attachment for contempt was involved, as aforesaid; in substance, a reiteration of the alleged conspiracy charged in the affidavit of June 2d, involving the charge of theft of papers in the case by Mr. Solicitor Timmerman, in conspiracy with Mr. Solicitor Benet and others; and, while reaffirming said charges, expressing regret and apology for the use of the intemperate language in which said affidavit was couched; the circumstances of extenuation being alleged to have been great haste in the preparation of the affidavit, without opportunity for revision of or reflection upon the same.

Whereupon, the issues being made up under said orders of the Court and the said returns, and the testimony thereon being delivered orally and stenographically reported, the State being the actor therein, and the hearing continuing through the said 15th of July and the next day, and argument being heard on behalf of the respondent (Mr. Attorney-General Lyon declaring his unwillingness to press the matter by argument, it being upon the facts for the Court, and, therefore, not arguing the same), the Court reserved its decision, and now, after due deliberation, proceeds to announce the same.

The questions arising for decision are whether, upon the record thus presented, said John T. Duncan should be disbarred and stricken from the roll of attorneys of this State, and (or) should he be punished for a contempt of this Court in respect to the matter of his affidavit of June 2, aforesaid.

Upon the question of the alleged affidavits of Taylor and Myers being false and fictitious, and being thus knowingly presented to this Court by Mr. Duncan as a basis for his motion for leave to apply for a new trial for Hunter in the Circuit Court, we have (neither purporting to have been signed by the affiant, but by mark) the affirmance of Duncan that the affidavits were fairly made by the alleged affiants,

and the pointblank denial of the affiants of ever having made or sanctioned them.

To properly solve this question, therefore, we are called upon to weigh it in the light of the intrinsic probabilities of the situation,—that is, is it probably true that Taylor or Myers would either have made the affidavit purporting to have been made by him for Duncan?

As to Myers, there is no light thrown directly by these probabilities. He merely states that Taylor was at the house where the shooting took place; but as to Taylor, the Duncan affidavit, if genuine, would have him confessing to a crime for which another had been tried and convicted, and to a perjury at that trial; for he had there sworn that he was not at the house and knew nothing of the shooting.

We start then with that as an intrinsic improbability. The next point is, is it true that he and not Hunter did the shooting, and, if true, and the fact that an innocent man had been convicted for his crime would be a cause impelling him to confess, then that might be taken as an intrinsic probability that he would make the affidavit Duncan claims he made.

This point drives us to inquire, whether or not it is true that Taylor and not Hunter did the shooting.

After a careful consideration of all the evidence, we cannot but answer this question in the negative and underwrite the verdict of the jury which convicted Hunter.

There is, of course, some conflict in the testimony upon which Hunter was convicted in the Circuit Court, as well as that taken in this Court, upon this question, as there will ever be in the investigation of issues of fact; but, throughout, there is the direct testimony of unimpeached eye-witnesses that Hunter's wife handed him the gun, after a parley with the *posse* which had come to his house to arrest him, and that he did the shooting. Then we have the testimony of Sheriff Coleman, of Richland county (not brought forward at the trial on circuit), of the confession of Hunter to him, very shortly after his arrest. From this testimony it

appears that Sheriff Coleman had known Hunter from boyhood and thought well of him, and was well disposed towards him, and, being surprised at his becoming implicated in so serious a charge, asked him in a friendly way why he had done it, whereupon Hunter acknowledged having fired upon the *posse,* his excuse being that it was done under the advice of Mr. Duncan, his attorney.

There is positive evidence that Taylor was not at the house, corroborative of his own statement to that effect, and no motive can be traced to him for having done the shooting. On behalf of Duncan's theory throughout, that Taylor was the guilty man, we have the suggestion that Taylor, being at the house, shot in defense of Hunter, whom it is charged fled under a corner of the house, the *posse* opening fire on him there, and it was intimated in support of this theory that the marks of shot in that portion of the house would demonstrate the theory. This was a matter susceptible of direct proof, but none was brought forward. Some of the witnesses brought forward on behalf of Mr. Duncan at this hearing failed utterly to corroborate this theory. The testimony from the weather bureau office at Columbia, nine miles from the scene, as to the cloudy condition of the weather at Columbia, and the inference sought therefrom, that Hunter could not have been visible for identification, fails to outweigh the positive testimony of the witnesses who were at the place and swear that there was enough light for them to see, and that they did see and identify Hunter. So we search the record in vain for a reasonable doubt as to the guilt of Hunter.

We find as a fact, therefore, that Hunter and not Taylor did the shooting, and was properly convicted therefor, on the testimony adduced at the trial in the Circuit Court, strengthened by the developments at the hearing here.

As Hunter did the shooting, and Taylor was not even present, it follows that it is highly improbable that he, Tay-

lor, would have made the affidavit which Duncan claims he made.

In the light of this doubly demonstrated improbability, we come to a consideration of the facts surrounding the preparation and alleged execution of said affidavit.

Here we have Mr. Duncan swearing that Taylor did make it, before Mr. Clark, a notary public and member of the Richland bar, in his, Duncan's, office, in the presence of Mrs. Stewart, his stenographer; Mr. Clark's testimony, which is rather in the way of negative testimony, that he cannot swear whether he took such an affidavit, coupled, however, with his recollection of having sworn, at his own office, a tall, black negro, whom he believed to be Taylor (but who proved to be Hunter and not Taylor), for Duncan; the innuendo being that Duncan had some other negro to impersonate Taylor before Mr. Clark.

Then we have the testimony of Mrs. Stewart, Mr. Duncan's former stenographer. We find this testimony clearly to establish the fact that in making her affidavit of the 29th of May, 1908, presented by Mr. Duncan as corroborative of the authenticity of his Taylor affidavit, hereinbefore referred to, wherein she appears to have substantiated the authenticity of the Taylor affidavit, as against the want of distinct recollection of Mr. Clark, she appears to have been entirely misled as to the contents of the affidavit, and did not intend and did not realize that she had given any such positive detailed statement of distinct recollection upon the subject. She now states that that affidavit was not explained to her by Mr. Duncan, and that, as a matter of fact, under oath as a witness in this Court, in this proceeding, she cannot substantiate Mr. Duncan's claim that Taylor appeared in his office and made the affidavit in question.

Other circumstances, going to throw the weight of the testimony against the authenticity of the Taylor affidavit, are that Taylor can write his name, and does sign his name wherever called upon to do so; whereas the disputed affidavit

here only purports to be signed by him by his mark; and then the circumstances of the non-exhibition of the original affidavit in this Court, or, if ever produced, its mysterious disappearance.

As Mr. Duncan accounts for the non-production or disappearance of the original of the affidavit by a direct charge of theft of same by Mr. Solicitor Timmerman, in conspiracy with Mr. Solicitor Benet and others, and thereby raises a collateral issue, whereby he seeks to justify the truth and language of his affidavit of June 2, 1908, we pause here to weigh the evidence upon the point, and our finding of the fact is that this charge is absolutely unwarranted and unsustained by the testimony.

The only fact upon which it appears that the charge could have had an origin was that some of the papers in the appeal in the Hunter case were not to be found in the office of the Clerk of this Court when called for; but this was entirely and satisfactorily explained by Mr. Solicitor Benet, showing that they had been in the official possession of Mr. Solicitor Timmerman, who had laid them aside, considering the case at an end, and when it was renewed, on the motion of this Court, he turned them over to his successor, Mr. Solicitor Benet, who brought them into this Court and had them duly lodged and exhibited. Mr. Duncan himself, as a witness herein, confesses to the sufficiency of this explanation. So far as the original of the alleged Taylor affidavit is concerned, there is no sufficient proof that it ever was filed or exhibited in this Court, or was ever seen by Solicitors Timmerman or Benet. A marginal note, made by Mr. Solicitor Timmerman on a copy of the Taylor affidavit, used at the hearing in this Court, to wit. "This not in original" (being opposite some immaterial interlineations thereon), is strongly relied upon by Mr. Duncan as indicating that Mr. Solicitor Timmerman must have had before him at that time the original, and, comparing it with the copy, found these interlineations in the copy but not in the original. There

would seem to be some plausibility in this theory, but it is entirely explained away by Mr. Solicitor Timmerman, who swears in his testimony that he never had seen the original; that it was never served upon him at Lexington, as Duncan swears it was, and that his marginal entry was merely as a memorandum for himself, as this was a copy being used in Court, to remember to look up the original and see if the copy corresponded with it; he having cause, as he says, sufficient unto himself, for suspecting the good faith of the whole transaction at the hands of Mr. Duncan.

All of this is against the truth of Mr. Duncan's grossly expressed charge, as against Solicitors Timmerman and Benet, and we unhesitatingly and emphatically find it, as aforesaid, as untrue, and, upon this testimony, completely exonerate these gentlemen therefrom.

Returning now to the main issue, as to the truth or falsity of the charge of Mr. Duncan, having knowingly presented to this Court an affidavit purporting to be made by Taylor, but not in fact made or authorized by him, we have found: That it would be improbable for a man to confess a crime for which another had been tried and convicted, and at whose trial he had testified that he was not at the place and knew nothing of it; that the allegations of the disputed affidavit are not true, which render it still more improbable that he would make such an affidavit; that he had no motive for doing the shooting or making an affidavit falsely confessing to it; and that the circumstances, beyond Taylor's mere denial of it, go far towards showing that he did not in fact make it, while, in support of its genuineness, there is only the bald testimony of Mr. Duncan that he did make it.

While, even under this state of fact, we might be unwilling to decide (and the writer of this opinion feels that he would not concur in so deciding, realizing the facility with which negroes may repudiate their affidavits, under apparently corroborative circumstances, and the jeopardy in which

every lawyer would stand were a disbarment to be predicated upon this alone) that the affidavit was in fact never made or authorized by Taylor, we cannot here hesitate to do so when against the probable truth of Mr. Duncan's testimony leans the heavy weight of his mortally wounded reputation for truth and veracity as a witness.

Mr. Duncan having become a witness in the matter, his reputation for truth and veracity as such became assailable, and, on behalf of the State, nearly a score of representative members of the Richland bar, and men of other callings, living in Columbia, were called upon to testify, and did testify, that Mr. Duncan's reputation for truth and veracity was known to them, was constantly discussed, was bad, and that he would not be believed upon his oath in any matter affecting his own interests; and the cross-examination of some of the witnesses disclosed a completely shattered reputation generally at the bar.

So also it is that, in the official reports of this Court, we find the respondent herein, John T. Duncan, admitted to the bar during the year 1896, vol. 48 of the South Carolina Reports, initial page.

In 64 South Carolina, page 461, we find the opinion of the Court delivered by Circuit Judge Benet, acting Associate Justice, concurred in by Y. J. Pope, Justice of the Supreme Court, now Chief Justice, and Circuit Judge Hudson, then acting Associate Justice, in a disbarment proceeding against this same respondent, wherein he was barely exonerated from a charge of malpractice as an attorney, with some condemnation and kindly admonition.

The opinion of the Court in that matter commenced by animadverting upon the unique feature of it, in that it was instituted at the instance of a single member of the bar only.

In this similar proceeding here, against the same respondent, within thirteen years only of his said admission to the bar, and notwithstanding said kindly admonition and the ordeal of it, we find again a fact unique, that the proceeding

here is instituted by the highest Court of the State of its own motion, and without a single member of the bar at which he has continuously practiced, nor any other lawyer or citizen from anywhere, coming forward to say a word in support of his character or in rebuttal of the mass of testimony by which that character has been so completely demolished.

Among his brethren at the bar, and among all his fellow-men, therefore, respondent stands alone at the bar of this Court, impaled upon the testimony which has been brought forward directly upon the charges urged on behalf of the State by her Attorney-General, and that in his behalf by the able attorney of another county, who had so generously and unflinchingly represented him at this hearing, with no prop of good repute upon which to lean in this, his hour of need.

For those who minister in our temples of justice, in the light of the deductions which have been hereinbefore made, and the conclusions which inevitably therefrom hereinafter follow, this Court cannot but call to their attention the obvious value of good repute.

While "custom and experience have placed values upon most of the treasures of mankind, no effort of the human mind has ever been able to estimate and determine the value of a good character;" but herein no one can fail to realize but that it is in a pinch like this that character saves a man or the demonstrated lack of it overwhelms him.

Having now reached the conclusion that respondent has been proven guilty of the charge of knowingly presenting false and fictitious affidavits to this Court, we do not hesitate to hold, and elaboration of reasoning is unnecessary to justify the decision, that for this act, coupled with the fact that his reputation as an honorable lawyer is completely broken down, and that he has had fair warning, but has not heeded it, he should be forever disbarred and stricken from the roll of attorneys of this Court; and that no lesser punishment would be commensurate with the conduct proven.

302                IN RE DUNCAN.

So much fine language has been written, and so thoroughly has been exhausted the theme of the lawyer's duty to society and the Court, and so exhalted has been the standard which has been fixed and adhered to in this State, and to which this Court will forever insist upon adherence, that we decline entering upon any reiteration thereof herein. Suffice it to say, that when one of our lawyers so far forgets the high ideals of his profession as to stoop to the practice herein proved against respondent, and to so have forfeited his good name amongst his associates, however harsh it may seem, and howsoever it may bend in pity over the ruined career of a fellowman, and of all those affected by its judgment, this Court can never hesitate, either upon its own motion, as herein, or upon a proceeding properly coming before it otherwise, to mete out the extreme penalty.

Proceeding now to a consideration of the charge of contempt of this Court as against Mr. Duncan, advanced by the Attorney-General in relation to the offensive language contained in the affidavit of June 2d; while we feel that it has been clearly established that the charges contained in said affidavit, as before stated, are wholly unfounded, and the language wholly improper and impertinent, and such as would be visited with proper and appropriate punishment, as being in contempt of the proprieties to be observed in our courts, yet here, the proceeding for complete disbarment having prevailed, any punishment, no matter how severe, incident to and at all commensurate with such contempt, is so wholly swallowed up in that following said disbarment charge that any official fixing and enforcement of it would be futile, and serve but to belittle the terrible penalty which follows the findings herein.

At the conclusion of the hearing, the Attorney-General moved that the Court also consider the question as to whether or not it would order said affidavit of June 2d expunged from its records, and asked that it be expunged.

We are unwilling to grant this motion. Having considered the affidavit and found that the charges therein are unsubstantiated, we prefer that the whole record should remain as filed herein, including said affidavit.

The order of the Court, therefore, is: That said John T. Duncan be, and he is hereby, ordered to be stricken from the roll of attorneys of this State, and that he appear before the Clerk of this Court and render up unto him his certificate of admission to practice law in this State for cancellation by said clerk; and that he, the said John T. Duncan, from henceforth and forevermore, be disbarred and not be heard as an attorney or counselor at law, nor otherwise act as lawyer in the State of South Carolina, nor in any other State, basing his claim upon the same certificate hereby ordered to be cancelled and forfeited; and let the decretal portion of this opinion be forthwith served on said John T. Duncan.

And it is so ordered.